UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| KAREN ROBERTS MIXON, ET AL. | * | CIVIL ACTION NO. 20-1216 |
| | * | |
| VERSUS | * | SECTION: "E"(1) |
| | * | |
| JAMES POHLMAN, ET AL. | * | JUDGE SUSIE MORGAN |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JANIS VAN MEERVELD |
| ************************************ | * | |

ORDER AND REASONS

Before the Court is Plaintiffs' Motion in Limine for an Adverse Evidentiary Presumption Due to Defendants' Spoliation of the Evidence and for Sanctions. (Rec. Doc. 87). For the following reasons, plaintiffs' Motion is DENIED.

Background

This is a §1983 lawsuit arising out of the death of Edward Mixon while incarcerated at the St. Bernard Parish Prison. Mixon was arrested and taken into custody on October 24, 2019. At the time, he suffered from chronic obstructive pulmonary disease, atrial fibrillation, high blood pressure, and cardiological problems for which he was receiving treatment and taking prescribed medication. He was also addicted to opioids. Plaintiffs allege that Mixon notified prison staff of these medical concerns during his initial screening but the prison did not administer his prescriptions or render appropriate medical care. Plaintiffs allege that Mixon's condition deteriorated rapidly. He died in his jail cell on October 28, 2019.

An investigation was conducted by Detective Jessie Gernados of the Detective Bureau, the detective agency within the St. Bernard Parish Sheriff's Office. She requested a copy of the video surveillance of Mixon's cell from midnight on October 28, 2019, through the time shortly following his death. (Rec. Doc. 93-8). Deputy Warden Justin Meyers, who is in control of the

1

surveillance video, explained in his deposition that the surveillance video recording on the system writes over itself 20-30 days after being recorded. (Rec. Doc. 93-9, at 1). When surveillance video is requested, he enters the requested start and stop time and downloads the entire video during that period. Id. In this instance, he made a single copy of the video for October 28, 2019, for Gernados. Id. Gernados confirmed in her deposition testimony that she requested the entire period from midnight through shortly after Mixon's death and did not request only portions of that time. (Rec. Doc. 87-6, at 9). Meyers testified that every time he downloads a video he tells the person requesting it that if there is anything missing they should let him know because he is on a time limit due to the video being overwritten. (Rec. Doc. 93-11). Gernados admitted in her deposition that video from the entire time of Mixon's incarceration was available to her during her investigation—which she completed on or about November 21, 2019. Id. at 5. She testified that additional video beyond what she requested was not necessary for her investigation. Id.

On November 22, 2019—29 days after Mixon's arrest and 25 days after his arrest—the Sheriff's Office received a letter from Mixon's family's counsel advising them of his representation and asking that "all documents regarding [Mixon's] arrest together with any and all video and/or audio recordings regarding his arrest, incarceration and medical treatment administered" be retained. The letter was forward to the Sheriff's Office's attorney on November 25, 2019.

Mixon's surviving wife and sole daughter filed this lawsuit on April 17, 2020, seeking damages under 42 U.S.C. §1983 for violation of Mixon's Fourteenth Amendment and Eighth Amendment right to be free from deliberate indifference to his serious medical needs while incarcerated. Trial is set to begin on August 1, 2022.

There have been issues with production of the video surveillance from the start. After several promises that defendants would produce the video went unfulfilled, plaintiffs filed a motion to compel. The court ordered production of the video in November 2021. The first copy of the video was corrupted. The next copy produced on a USB drive contained the video from October 28, 2019, however, certain sections of time were missing. Plaintiffs have identified the following missing segments:

- Between 00:04:14 and 00:24:59

- Between 00:25:47 and 03:53:49

- Between 04:00:25 and 04:09:56[1]

After determining that the video they received contained missing sections, the plaintiffs filed a motion to compel production of the entire video. The court ordered that the parties meet and confer and submit a status report stating whether they had resolved the dispute. In their status report, defendants asserted that they had produced the entirety of the video that had been referred to in the Incident Report pertaining to Mixon's death. (Rec. Doc. 63, at 4). They asserted that Gernados had requested portions of the video she deemed relevant and that same video had been entered into evidence at the Sheriff's Office and a copy of that same video had been provided to the plaintiffs. Id. They asserted they had provided all videos in their possession, noting that surveillance video is maintained for a limited period before it is recorded over. Id. They asserted that by the time they received plaintiffs' request that video be preserved in November 2019, all video (other than the copy put into evidence by Gernados) was no longer available. Id.

On November 22, 2021, the court denied the motion to compel as moot and without prejudice to any right plaintiffs might have to seek sanctions with regard to the loss of allegedly

---

[1] Plaintiffs identified these segments in briefing the present motion. They did not identify any additional segments when questioned at oral argument.

relevant evidence. The parties continued to prepare for trial—including conducting discovery into the circumstances surrounding the gaps in the video footage—and on May 24, 2022, plaintiffs filed the present motion for sanctions. Oral argument was held on July 6, 2022, the submission date selected by the plaintiffs.

Of note, while the summary of the surveillance video in Gernados' report does not reference the gaps in footage identified by the plaintiffs, it does reference the following missing footage:

- Between 09:28:50 and 09:29:05

- Between 09:34:50 and 09:34:56

- Between 09:36:00 and 09:37:00

- Between 09:41:40 and 09:41:47

- Between 09:41:55 and 09:42:00

(Rec. Doc. 93-12, at 5-6). Gernados also included a note that the video outages referenced in her report were caused by an accident with injury that occurred around 0930. Id. at 6. She explained in her deposition that a car accident had knocked over a transmission line at that time. (Rec. Doc. 93-14, at 1-2). Although Gernados testified in her deposition that she had requested the video without gaps and that when she viewed it, it contained no gaps, defendants' counsel asked her to review the video since she had last viewed in 2019. (Rec. Doc. 87-6, 15-16; Rec. Doc. 93-16; Rec. Doc. 93-17). Following the deposition, she executed an affidavit in which she states that she viewed the video again on April 27, 2022, and discovered that she had been mistaken in testifying at her deposition that the video was continuous and did not contain any gaps. (Rec. Doc. 93-21, at 2) She stated that she made no alterations or deletions of any type to the jail video that was provided to her by Meyers and placed into evidence. Id.

4

In their motion, plaintiffs ask this court to enter an order instructing the jury of a mandatory inference that the missing video evidence would have been favorable to plaintiffs in meeting their burden of deliberate indifference and unfavorable to defendants in defending that they acted without deliberate indifference. They argue that sanctions for spoliation are warranted here. First, they argue that defendants had a duty to preserve the entire surveillance video from the date of Mixon's incarceration through his death at the time the video was destroyed. They point out that plaintiffs' counsel sent a preservation letter that defendants received on November 22, 2019, twenty-five days after Mixon's incarceration, while Meyers testified that there is a 20 to 30 day period before the video records over itself. Even if the video was already over-written when the preservation letter was received, plaintiffs argue that defendants clearly had an obligation to preserve the entire video requested by Gernados before that time.

Next, plaintiffs submit that the video was relevant to their claims because it would show the treatment of Mixon by the staff, whether Mixon requested assistance, whether he was ignored, and whether guards ignored his rapidly deteriorating condition. They argue that defendants were aware that video surveillance of Mixon's incarceration was probative and relevant, especially because such surveillance was—according to plaintiffs—crucial in the prosecution of St. Bernard Parish prison guards after the death of Nimali Henry while incarcerated in the St. Bernard Parish Prison after she was not provided life-saving medication to treat her blood disorder.

Third, they argue that defendants destroyed and altered the video in bad faith. They point to the testimony of Gernados that she pulled and retained copies of all of Mixon's phone calls during the time of his incarceration. And yet, she determined to limit her request for video surveillance from midnight of October 28, 2019, through the time of Mixon's death. They point out that Gernados testified that she reviewed the entire day of footage from October 28, 2019, and

that the video was continuous. They add that Meyers testified that the Sheriff's Office does not have a policy of retaining video after a death in custody. They submit that the defendants' representations and deposition testimony make clear that defendants were aware of their duty to preserve the video evidence in question. They argue that defendants knew that if plaintiffs had access to the entire video of Mixon's incarceration, they would be able to prove the deliberate and willful disregard exhibited by the prison guards toward Mixon. Further, they argue that the portions of the video missing from the October 28, 2019, footage should be presumed to contain crucial information. They insist that Gernado's testimony that the video she received was continuous establishes that the video was significantly altered before it was produced to the plaintiffs.

In opposition, defendants address both plaintiffs' argument that they should have preserved all video during Mixon's incarceration and their argument that the October 28, 2019, video was altered. First, defendants argue that they did not have a duty to preserve the video from October 24 to October 27, 2019, until they received notice of the litigation from plaintiff's counsel on November 22, 2019. They say—citing only Meyer's testimony that the video surveillance is automatically rewritten 20 to 30 days after it is created—that by the time they received counsel's letter, the video had already been destroyed.

As to the October 28 video, defendants argue that they did not alter it. They submit that Gernados provided their counsel with an exact copy of the same thumb drive that she put into evidence during her investigation and that the thumb drive Gernados put into evidence is the same one that Gernados received from Meyers when she asked him to download the video from midnight on October 28, 2019, through the time shortly after Mixon's death. They cite Meyer's testimony that when he downloads a video, he enters a start and stop time into the computer and downloads the entire period. They explain that although Gernados testified that the video she reviewed was

continuous, that was because she had not seen the video in over two years. They say that once she reviewed it again, she realized that she was mistaken in stating that the video was continuous. They submit that Gernados confirmed that the video in evidence is the exact video she reviewed as part of her investigation and that she did not make any alterations or deletions. Defendants add that once the video was placed in evidence, no one had access to it other than Gernados and detective Delery who simply returned the video to the evidence room. They attach a copy of the custody history for the thumb drive. Defendants acknowledge there are gaps in the video produced. They point to Meyers' testimony that he would explain such a gap as being a result of a faulty DVR or in the program itself. They also note there was a car accident that caused a power outage and video outages on October 28, 2019. They argue that they did not intentionally alter or destroy any of the October 28, 2019, video.

Further, defendants argue that there is no evidence to establish bad faith on the part of the defendants with regard to the October 24-27 video or the gaps in the October 28, 2019, video. They argue that sanctions are not justified here.

In reply, plaintiffs insist that sanctions are indeed warranted because defendants' duty to preserve the entire surveillance video arose even prior to their counsel's November 22, 2019, letter. They argue that bad faith can be inferred when a party has failed to preserve evidence despite knowing that it could be relevant to pending litigation. They submit that defendants knew the video was relevant yet they knowingly destroyed it. Plaintiffs also ask this court to reject Gernados' self-serving statements in her affidavit that she was mistaken and that the video she received from Meyer was actually not continuous.

During oral argument, the court reviewed Gernados' summary of the October 28th video footage with plaintiffs' counsel. It shows Mixon had a fairly normal morning—getting up to use

the bathroom at 4:30, talking to an inmate and getting his food at 5:33, talking to cell mates and eating at 5:42, exiting his cell to call his wife at 8:12, speaking to a nurse at 9:07 and apparently taking medication at 9:10, and returning to the nurse at 9:11 because the nurse forgot to give him his medication. (Rec. Doc. 87-7, at 5).[2] Gernados' summary of the recording of the 8:14 phone call between Mixon and his wife notes that Mixon "Says is taking detox meds, still feels like shit but not as bad. Normal conversation, laughing and joking.  Mixon tells Karen he misses her and how he masturbated last night while thinking about her.  Conversation continues until call ends." Id. at 8.  Plaintiffs' counsel did not dispute Gernados' summary or that for the period from 4:30 until 9:11, everything was fairly normal. When asked by the court to explain what the missing video segments before 4:30 a.m. and the missing video from the preceding days might show in plaintiffs' ideal case, counsel said the video would show him suffering illness, that he would be throwing up at times, and that guards passed by and laugh.

In a supplemental brief filed by plaintiffs after the hearing, plaintiffs request that to the extent the court finds that the defendants did not intentionally destroy the video and that an adverse presumption is not warranted, that the court instead issue an order allowing them to present evidence of the destruction to the jury. They point to a case out of the Eastern District of Virginia where such sanctions were issued when jailhouse video surveillance was routinely destroyed following an inmate's death. They also invoke, for the first time, Federal Rule of Civil Procedure 37(e) pertaining to the destruction of electronically stored information.

Defendants respond that plaintiffs should have raised the issues they now raise in sur-reply in their original motion or reply memorandum. They argue the Fifth Circuit case Caparotta v.

---

[2] Moments later the situation deteriorated. At 9:12 he lay down on his stomach and his breathing became labored, and at 9:17 it appeared he was not breathing. (Rec. Doc. 87-7, at 5). A code blue was called at 9:41 when a Sergeant entered Mixon's cell during a headcount upon receiving no response. Id. at 6. Two nurses responded and CPR was initiated at 9:43. Id.

Entergy Corporation, cited by the plaintiffs in support of allowing the jury to consider evidence that documents were destroyed even where there is no bad faith, actually supports defendants' position because in Caparotta, the Fifth Circuit held that evidence that documents had been destroyed should not have been presented to the jury where there was no bad faith. Like the Fifth Circuit held in Caparotta, they suggest a jury instruction that the surveillance video was destroyed but there was no evidence of bad faith on the part of the defendants. They also argue that Rule 37(e) does not entitle plaintiffs to the relief they seek because they had no duty to preserve the video in question at the time it was lost. Further, they argue that there is no evidence that defendants failed to take reasonable steps to preserve the October 28 video. Defendants add that plaintiffs had ample opportunity to obtain comparable evidence through the depositions of the guards, the nurses, and other inmates who had contact with Mixon during his incarceration. But they did not do so. They note that they produced contemporaneous jail logs, jail phone calls, interviews with other inmates, complete medical records, and a complete investigative report that assists in providing information regarding Mixon's incarceration during the period where there is no video.

Law and Analysis

### 1. Standard for Spoliation

A party to litigation has a duty to preserve evidence once "the party has notice that the evidence is relevant to the litigation or should have known that the evidence may be relevant." Guzman v. Jones, 804 F.3d 707, 713 (5th Cir. 2015). But the threat of litigation does not obligate an organization to "preserve every shred of paper, every e-mail or electronic document, and every backup tape." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). A party "is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be

9

requested during discovery and/or is the subject of a pending discovery request." Id. (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)); see Ashton v. Knight Transp., Inc., 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011) ("A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation."); Garnett v. Pugh, No. 14-479, 2015 U.S. Dist. LEXIS 33593, at *11 (E.D. La. Mar. 18, 2015) ("In order for a party to have a duty to preserve evidence, the party must have notice that the evidence is relevant to litigation."). For example, in McDuffie v. Hillstone Restaurant Group, the plaintiffs sought video of the ten minutes before and after a slip and fall accident. No. 16-6733, 2017 U.S. Dist. LEXIS 229750, at *11 (E.D. La. July 7, 2017). They admitted that the footage would not have shown the accident but argued that it would show the amount of lighting in the hallway. Id. at *5. The district court held that because the footage did not depict the actual accident "there is no reason Defendants would have known this evidence was necessarily relevant to the litigation." Id.

"If a party intentionally destroys evidence, the court has the discretion to impose sanctions." Dixon v. Greyhound Lines, Inc., No. CIV.A. 13-179-JWD, 2014 WL 6087226, at *2 (M.D. La. Nov. 13, 2014). The parties here agree that the adverse inference sought by plaintiffs can only be imposed if plaintiffs establish that

> (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the evidence was destroyed with a *culpable state of mind*; and (3) the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Thomas v. Tangipahoa Par. Sch. Bd., No. CV 14-2814, 2016 WL 3542286, at *1 (E.D. La. June 29, 2016) (quoting Thermotek, Inc. v. Orthoflex, Inc., No. 3:11-CV-870-D BF, 2015 WL 4138722, at *12 (N.D. Tex. July 7, 2015). While the burden rests with the party seeking the sanction, "[c]ourts recognize that '[t]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit

from its destruction.'" Rimkus Consulting Grp., Inc. v. Cammarata, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010) (quoting Chan v. Triple 8 Palace, Inc., No. 03CIV6048(GEL)(JCF), 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005)).

"Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." Guzman, 804 F.3d at 713. For example, in Guzman, a plaintiff in a personal injury action scheduled a surgery at a time when his counsel knew the defendants desired to conduct an independent medical examination. Id. The Fifth Circuit affirmed the district court's decision not to award spoliation sanctions, finding "there is no evidence to suggest that [plaintiff] acted in a manner intended to deceive [defendants] or that he undertook the surgery with the intent of destroying or altering evidence." Id. Similarly, the court does not typically "draw an inference of bad faith when the documents are destroyed under a routine policy." Dixon, 2014 WL 6087226, at *2; see Coastal Bridge Co., L.L.C. v. Heatec, Inc., 833 F. App'x 565, 575 (5th Cir. 2020) ("Adherence to normal operating procedures may counter a contention of bad faith."). Indeed, courts have observed that "bad faith means *more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives*." Thomas, 2016 WL 3542286, at *2 (quoting Industrias Magromer Cueros y Pieles S.A. v. Louisiana Bayou Furs Inc., 293 F.3d 912, 922 (5th Cir.), decision clarified on denial of reh'g, 310 F.3d 786 (5th Cir. 2002)); Vick v. Texas Emp. Comm'n, 514 F.2d 734, 737 (5th Cir. 1975) ("Mere negligence is not enough, for it does not sustain an inference of consciousness of a weak case." (quoting McCormick on Evidence § 273, at 660-61 (1972)). "However, bad faith may be inferred by evidence that a party has misrepresented the existence of documents or allowed the destruction of documents, and had explanations of spoliation that were not credible." Dixon, 2014 WL 6087226, at *2; see Ashton 772 F. Supp. 2d at 802-03 (concluding that when considering "all of Defendants' other

questionable post-accident conduct, the evidence is clear and convincing that the Defendants, purposefully, over a sustained period of time, engaged in a concerted effort to hide and destroy evidence" including the truck driver fleeing the scene of the fatal accident and falsifying his driver's log to show he was elsewhere at the time of the accident, the replacement of the tires on the truck two days later despite no indication in the driver's log that an emergency replacement was necessary, and the company's failure to preserve messages between the truck driver and the company in the hours and days surrounding the accident, despite a law enforcement request to preserve them).

In determining whether the destroyed evidence is relevant, courts consider "(1) whether the evidence is relevant to the lawsuit; (2) whether the evidence would have supported the inference sought; and (3) whether the non-destroying party has suffered prejudice from the destruction of the evidence." Dixon, 2014 WL 6087226, at *4 (quoting Consol. Aluminum Corp. v. Alcoa, Inc., 244 F.R.D. 335, 346 (M.D. La. 2006)). "[T]he moving party must provide 'some evidence that the documents would have aided it in the manner alleged in their inferences in order' for the court to find relevance and impose sanctions." Id. (quoting Consol. Aluminum, 244 F.R.D. at 347).

"Courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party." Ashton, 772 F. Supp 2d at 801. As the Rimkus court explained:

> A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice. Even if there is intentional destruction of potentially relevant evidence, if there is no prejudice to the opposing party, that influences the sanctions consequence. And even if there is an inadvertent loss of evidence but severe prejudice to the opposing party, that too will influence the appropriate response, recognizing that sanctions (as opposed to other remedial steps) require some degree of culpability.

688 F. Supp. 2d at 613.

For example, in <u>Thomas</u>, when the defendants received the plaintiff's Equal Employment Opportunity Commission Charge, they asked the employee who investigated allegations of illegal recruiting by plaintiff, a former assistant football coach, to provide them with all information maintained during his investigation. 2016 WL 3542286, at *2. The employee provided only some emails. <u>Id.</u> However, defendants attested that they searched his office at that time and when the employee retired but found no folders or files involving the plaintiff. <u>Id.</u> During the investigating employee's deposition, he testified that he kept notes during the investigation and kept them in a folder and that he thought he left the folder in his office when he retired or it might have gotten mixed up with other things. <u>Id.</u> The court denied plaintiff's request to instruct the jury that the investigative file would have revealed that plaintiff did not participate in any illegal recruiting activities. <u>Id.</u> at *3. The court found that:

> At most, the current record indicates that Jackson and/or defendants may have been negligent or incompetent in failing to preserve Jackson's file. Any inconsistencies between Jackson's testimony and the notes of the LHSAA investigator, or the lack of documentation of illegal recruiting allegations in plaintiff's personnel file, do not compel the court's imposition of the adverse presumption that defendants had an improper motive to conceal Jackson's file. Instead, they simply raise questions of credibility for the jury to resolve, including, for example, whether the reasons proffered by defendants for plaintiff's termination were pretextual. Certainly, these inconsistencies and the testimony concerning the circumstances surrounding the missing file may be presented for the jury's consideration at trial. On the current record, however, the court cannot conclude that the file was intentionally destroyed for the purpose of hiding adverse evidence.

<u>Id.</u>

Similarly, in <u>Jenkins v. Woody</u>, a case out of the Eastern District of Virginia cited by the plaintiffs because of the factual similarities to the present case, the court declined to find that the sheriff intentionally deprived plaintiff of the lost video and therefore would not issue an adverse inference or render a default judgment. No. 3:15CV355, 2017 WL 362475, at *17 (E.D. Va. Jan.

21, 2017). Nonetheless, the court awarded lesser sanctions. Id. at *18. Similarly to the present case, the video surveillance in Jenkins was automatically overwritten every 30 days, but unlike here, the defendants in Jenkins had not preserved any video: at issue was "a missing video that had recorded the last hours of Ms. Jenkins' detention, prior to her death." Id. at *2, 9. No video at all had been preserved. Id. at *6. The court found the sheriff could reasonably have anticipated litigation as soon as the inmate died in custody and that the sheriff should reasonably have known that the video would be relevant to any anticipated litigation. Id. at *14-15. The court further found plaintiffs had suffered grave prejudice from the loss of the video data, which would have been the only unbiased depiction of the events that occurred in the five to six hours preceding her collapse. Id. at *18. Thus, the court issued the following sanctions: the court would tell the jury the video had not been preserved; allow the parties to present evidence and argument regarding the destruction/failure to preserve the video; instruct the jury that the evidence could be considered; preclude any evidence or argument that the video would have corroborated the defendants' version of events; preclude any evidence or argument that on the day of her death, the decedent was exhibiting identical symptoms to those she exhibited when she saw a doctor the previous day; and award plaintiffs their reasonable fees and expenses. Id.

As the plaintiffs here point out, a court might admit evidence of destruction of documents if that evidence is relevant without any consideration of bad faith. See Caparotta v. Entergy Corp., 168 F.3d 754, 756 (5th Cir. 1999). In Caparotta, a box of relevant documents gathered by defendant's in-house counsel had been inadvertently incinerated. Id. at 755. Defendant was able to replace many of the documents, but not the original supervisor's file on the plaintiff. Id. The district court declined to issue an adverse inference instruction because there was no evidence of bad faith, but the court allowed the fact of the inadvertent destruction of evidence to be presented

to the jury because it was relevant to credibility and reliability "to some extent." Id. at 756. The Fifth Circuit held that the district court had abused its discretion in allowing such evidence to be presented to the jury. Id. at 758. Although the court of appeals found that the fact the documents were missing might have been relevant, it found that the way the information was presented to the jury was problematic. Id. at 757. Defendant's counsel had been required to testify regarding the destruction causing "substantial" prejudice, "it was confusing to the jury because it was unclear as to which issue the evidence was relevant," and throughout the trial it appeared that the parties were relitigating the spoliation issue. Id. at 757-58. The court of appeals concluded that "[i]t would have been more appropriate for the district court to have informed the jury that the documents had been inadvertently destroyed and that the district court found no bad faith on the part of Entergy." Id. at 758. Finding the district court had abused its discretion in allowing the evidence of document destruction to be admitted through the testimony of counsel and that the substantial rights of the defendant had been affected and the jury's judgment tainted, the Fifth Circuit vacated the judgment and remanded for a new trial. Id.

2. *Rule 37(e)*

Plaintiffs invoke Federal Rule of Civil Procedure 37(e) on in their post hearing memorandum. That rule provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37. This version of Rule 37(e) was adopted in 2015 was not intended to create a new duty to preserve, but instead sought to provide clearer and uniform standards because under the previous rule,[3] litigants were expending "excessive effort any money on preservation in order to avoid the risk of severe sanctions if a court finds they did not do enough." Id.  comments to the 2015 amendment.

### 3.  Video from October 24 to October 27, 2019

The court first considers the video from the first four days of Mixon's incarceration. Although there is a dispute as to when defendants' duty to preserve the video arose, both sides appear to agree the duty arose no later than November 22, 2019, when defendants received the litigation preservation letter from plaintiffs' counsel. For present purposes, Plaintiffs appear to accept defendants' representation that the video had been overwritten by that time. Plaintiffs argue that defendants should have known before then—in light of the death of Mixon and the case of Nimali Henry who died in custody five years earlier—that the video was relevant.

The death of an inmate is a serious incident, and the court has no trouble finding that this alone should have put the defendants on notice of impending litigation and created a duty to preserve evidence. However, it is not clear that this duty extended to the entirety of the existing video surveillance beginning from the moment of Mixon's incarceration. The duty to preserve extends only to evidence that the party knows or should know is relevant. See Zubulake, 220 F.R.D. at, 217. The circumstances of the death in custody will dictate how much video may be relevant.

---

[3] The previous rule adopted in 2006 provided, "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e) comments to the 2015 amendment.

For example, plaintiffs argue that such earlier video was relevant in the Nimali Henry matter. According to a news article cited by plaintiffs, Henry was suffering from a potentially fatal blood disorder and was in desperate need of her medication.[4] Video showed inmates expressing concern and talking to the guards about her and later showed her stumbling and barely able to walk as she was escorted by guards. She suffered for ten days without receiving any medical attention or being taken to the hospital. In the civil lawsuit filed by Henry's family after her death in the prison, the plaintiffs relied heavily on the video.

But the Henry differs from the present case. Video surveillance from the date of Mixon's death shows a normal day until 9:12 a.m. when he began having trouble breathing. Incident Report, Rec. Doc. 87-7, at 5-6. The contents of the recorded telephone conversation between Mixon and his wife on October 28 give no indication that guards were ignoring him or laughing as he suffered, as plaintiffs' counsel argued their ideal video would show.  Id.  at 8. Nor do Mixon's earlier recorded conversations indicate any such thing. Yet these earlier conversations do confirm plaintiffs' theory that Mixon was going through detox, throwing up, defecating everywhere, and feeling terrible. Id. On October 26 he told his wife that the nurses were not helping and told him it was something he needed to go through. Id. The next morning he told his wife that he still felt terrible, that he had received his medication, but that he was not receiving anything for detox. Id. Later that day, he reported he was sick as a dog and that the nurses would not give him Klonopin. Id. That evening, Mixon's wife informed him that she threatened the nurses with a lawsuit and that they agreed to put him on detox meds. Id. He said he was being taken care of. Id.

---

[4] Audry Killion, WDSU Investigates: Videos show final hours of St. Bernard woman who died in jail without her medication, WDSU (Feb. 10, 2021,  6:26 PM) https://www.wdsu.com/article/wdsu-investigates-videos-show-final-hours-of-st-bernard-woman-who-died-in-jail-without-her-medication/35470942# (last visited July 18, 2022, at 11:38 a.m.).

Plaintiffs point to Mixon's wife's threat of a lawsuit to support finding that defendants should have anticipated litigation earlier. Indeed, in preparing the incident report, Gernados listened to the phone conversation in which Mixon's wife reported her threat of a lawsuit in the context of her complaints that Mixon was not receiving the medication he needed. But Gernados did not save additional video in case it might be relevant to a claim related to the delay in providing medication.

Video surveillance from the date of Mixon's incarceration through October 27 was not rendered relevant solely by virtue of Mixon's death in custody. In contrast to the <u>Jenkins</u> case cited by the plaintiffs, where the sheriff's office failed to save video surveillance from the time of the inmate's collapse and the hours earlier, defendants here saved the video of the hours preceding and through the time of Mixon's death. And unlike the Nimali Henry case, Mixon was having a normal morning when he suddenly stopped breathing. There was nothing from the circumstances of Mixon's death that would have suggested to the defendants that video surveillance of his condition days earlier could possibly have been relevant.

The court acknowledges, however, that Mixon reported severe illness to his wife on October 26 and 27 and that his wife expressed concern about whether he was receiving medication that ultimately culminated in a threat of litigation. This came to the investigating officer's attention in the course of summarizing the telephone recordings. Importantly, though, the telephone recordings do not suggest a nexus between Mixon's wife's concerns and Mixon's demise on October 28. Indeed, he told his wife he was receiving his medications as of the evening of October 26 and that by the morning of October 28 he was taking detox medication. As noted above, Mixon's condition on October 28 appeared relatively normal for hours before he began having trouble breathing at 9:12 a.m. Although an especially vigilant investigator might have considered

that video from October 26 and October 27 could be relevant to possible litigation concerning an alleged delay in providing medication, the court cannot find that the facts and circumstances here created a duty to preserve such video.[5]

Even assuming defendants had a duty to preserve the earlier video surveillance before the video was automatically overwritten, there is no evidence of bad faith by the defendants. Deposition testimony shows there is no policy for preserving a specific amount of video following an inmate's death. There is no dispute that Gernados only requested, viewed, and saved video surveillance from October 28, 2019.[6] There is no dispute that video surveillance is routinely overwritten 20 to 30 days after it is recorded. To infer bad faith in this situation, the court must infer that without having viewed the October 24-27 video, Gernados believed it would have been favorable to the plaintiffs and that she therefore decided not to request and preserve it. There is simply no indication that this could be the case. Gernados has given contradictory explanations and testimony about the gaps in the footage, which are discussed further below. But she has not wavered in her explanation that she requested and viewed only the October 28 video. There is no circumstantial evidence—let alone direct evidence—to counter her explanation that she believed only the October 28 video was necessary to her investigation. Nor is there evidence that anyone else at the Sheriff's Office suspected that additional video surveillance might be detrimental to their case and they therefore simply allowed the automatic override process to take place without saving it. There is simply no basis to conclude that defendants destroyed the video with the intent to gain a tactical advantage.

---

[5] There is no basis from which to conclude that defendants were on notice that video from October 24 and 25 might be relevant.

[6] Gaps in the October 28, 2019, video footage are discussed below.

Plaintiffs correctly point out that bad faith can be inferred. But to infer bad faith, there must be circumstantial evidence of bad faith. In the <u>Ashton</u> case they cite, there was circumstantial evidence that the truck driver and the company he worked for had engaged in a concerted effort to destroy evidence. 772 F. Supp. 2d at 802-03. The truck driver fled the scene and falsified his driver's log to make it appear he had not been at the scene, the tires on the truck were changed days later while in the middle of a trip, and the company did not preserve communications between it and the driver in the hours and days surrounding the accident despite preserving communications beginning five days after the accident and despite a request from law enforcement to preserve all such communications within days of the accident. <u>Id.</u>  There is nothing comparable in this case from which to infer a concerted effort to destroy evidence.

Even if the defendants had a duty to preserve the October 26 and 27 video, their failure to do so was, at most, negligent. Without a finding of bad faith, an adverse inference as proposed by the plaintiffs is inappropriate.

In their post-oral argument supplemental memorandum, plaintiffs request lesser sanctions in the alternative. Because there was no duty to preserve, no such sanctions are appropriate. Even if there had been a duty to preserve the October 26 and October 27 video, the court finds the alternative sanctions proposed by the plaintiffs are not an appropriate remedy. Importantly, there is no basis from which to conclude that the plaintiffs suffered any prejudice by the missing October 26 and October 27 video. They have the telephone recordings in which Mixon reports his condition to his wife. They could have deposed the prison guards, the nurses, and Mixon's cell mates to find out more about his condition and the response of the prison staff. They did not do so. To allow the jury to consider evidence and argument about why the video was destroyed and what it would have shown as to Mixon's condition and the defendants' treatment of Mixon  when plaintiffs have failed

to conduct any investigation into the alternative sources of such information would be a windfall to the plaintiffs. As in Caparotta, where there had been a duty to preserve but no evidence of bad faith, allowing such argument and evidence to be considered by the jury would substantially prejudice the defendants.

But the fact remains that the video was destroyed and that it could have been relevant. Considering that defendants arguably had a duty to preserve the October 26 and October 27 video during the course of Gernados' investigation when she listened to the recorded phone calls, it may be appropriate for the court to notify the jury via an instruction—not evidence or argument—that the video surveillance from October 26 and October 27 was destroyed 20 to 30 days after it was recorded pursuant to the defendants' routine overwriting policy without having been viewed or determined relevant by the defendants. The precise instructions to be presented to the jury, however, are better decided by the trial judge. The parties may present proposed jury instructions concerning the missing video surveillance to the district court for consideration along with their other proposed jury instructions.

   *4. Video on October 28, 2019*

The court next considers the gaps in the surveillance video for the day of Mixon's death. There is no dispute that defendants had a duty to preserve this video, nor that gaps exist.

However, the court will not issue any sanctions. First, the court cannot conclude from the evidence that defendants acted in bad faith. Although there is some conflicting evidence about how the gaps came to be, the evidence supports finding that the video that was produced to the plaintiffs is the same video that was downloaded and reviewed by Gernados. With regard to the gaps between 9:30 and 9:42 a.m., they were observed and noted by Gernados in her report along with a reference to power outages caused by a car accident. It is not clear if plaintiffs dispute the existence

of a power outage that affected the video recording, however, the court finds this contemporaneously provided explanation is sufficient to conclude that these gaps were not purposely caused by the defendants in bad faith.

It appears all of the other gaps (at least, those identified by plaintiff) took place during the block of video footage from 00:00 to 04:30 described by Gernados as "Mixon asleep in bunk (during that time at 0024hrs Deputy enters tier, walks upstairs to check on inmates then walks downstairs to check the other inmates. At 0353 hrs, same Deputy enters tier checking all inmates)." (Rec. Doc. 93-12, at 5). Gernados did not note these gaps in her summary of events or request a new download indicating either that she didn't notice the gaps in viewing the footage of the sleeping Mixon or that the gaps were not there at the time. The former explanation is more likely considering that there is no evidence to corroborate the theory that Gernados created the gaps or that anyone else had custody of the thumb drive after her to be able to create the gaps.  While there is no clear or definite explanation for these gaps, it also appears that the best explanation is that there was an error either in the recording or the downloading that was not noticed until plaintiffs reviewed the video in 2021. Again, this is not a case where there is any circumstantial evidence to suggest that there was an effort to destroy relevant evidence.[7]

Moreover, there is no reason to believe that the gaps appearing before 4:30 a.m. on October 28 would have shown anything of particular relevance to the treatment of Mixon by prison staff. Importantly, the undisputed summary of Mixon's activities on the morning of October 28 show normal behavior. There is no reason to believe that he would have been sick and ignored between

---

[7] Plaintiffs make much of the conflicting explanations of the gaps in the video. First defendants said Gernados had only downloaded portions of the video. But it is unclear whether the reference to "portions" referred to the fact that Gernados had only downloaded the October 28 video or to the fact that the October 28 video contained gaps. Gernados later testified that the video she had reviewed was continuous. But this was obviously a mistake in her testimony because her own report issued in 2019 refers to gaps in the video, albeit later that morning. Her affidavit later confirms that she was mistaken about continuity because she had not reviewed the video since more than two years earlier.

midnight and 4:30 a.m. especially when he did not describe having been ill or that he had been ignored in asking for help when he spoke to his wife around 8:00 a.m.

As to the gaps in the October 28 video, there is neither evidence of bad faith nor any basis to find prejudice to the plaintiffs. No sanctions will be issued.[8]

5.   Rule 37(e)

The court notes that Rule 37(e) was not invoked by the plaintiffs in their motion and their attempt to provide a new basis for relief in a post hearing supplemental memorandum is inappropriate. In any event, the standards provided by Rule 37(e) are comparable to the case law relied on by both parties and discussed above. To the extent Rule 37(e)(1) might provide an alternative basis for the sanctions that plaintiffs here seek, the requirements of Rule 37(e) have not been met. As discussed above, the court has found that defendants did not have a duty to preserve the October 24-27 video. Thus, there was no "electronically stored information that should have been preserved in the anticipation or conduct of litigation." As to the October 28 video, there is no evidence to support finding the defendants failed to take reasonable steps to preserve the video. To the extent Rule 37(e)(1) applies, the prejudice to the plaintiffs resulting from the destruction is minimal and would require, at most, a jury instruction of the type contemplated above. Clearly Rule 37(e)(2) is inapplicable in light of the court's finding that there is no evidence of an intent to deprive the plaintiffs of the use of the video surveillance.

Conclusion

Plaintiffs' Motion in Limine for an Adverse Evidentiary Presumption Due to Defendants' Spoliation of the Evidence and for Sanctions (Rec. Doc. 87) is DENIED. With regard to the October 24 and October 25 video, the court finds no duty to preserve and no prejudice to the

---

[8] Again, the parties are free to propose jury instructions that will inform the jury that certain portions of the video surveillance are missing.

plaintiffs and will not issue sanctions. With regard to the October 26 through October 27 video, the court finds that no duty to preserve arose and that, even if a duty had arisen, there is no evidence of bad faith, which precludes the issuance of an adverse inference. With regard to the October 28 video, although there was a duty to preserve the video in its entirety, the court finds no evidence of bad faith nor any evidence to support finding plaintiffs have been prejudiced by the missing sections. Although no sanctions will be issued as a result of the missing October 26 and 27 video and the gaps missing from the October 28 video, the parties may propose jury instructions to inform the jury that such video surveillance was unintentionally destroyed.

New Orleans, Louisiana, this 21st day of July, 2022.

Janis van Meerveld
United States Magistrate Judge

24